# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs March 8, 2011

## D'ANGELO MARQUEZ JENKINS v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40700857    Michael R. Jones, Judge**

---

**No. M2010-01083-CCA-R3-PC - Filed August 30, 2011**

---

The petitioner, D'Angelo Marquez Jenkins, pled guilty in the Montgomery County Circuit Court to facilitation of aggravated robbery and being a felon in possession of a handgun. Pursuant to the plea agreement, he received a total effective sentence of nine years and six months. Thereafter, the petitioner filed for post-conviction relief, alleging that his trial counsel was ineffective and that his pleas were not knowingly and voluntarily entered. Specifically, the petitioner complained that trial counsel failed to interview or subpoena witnesses on the petitioner's behalf or pursue DNA evidence. The petitioner also contended that his guilty pleas were the result of counsel's ineffective assistance and prosecutorial misconduct. The post-conviction court denied the petition, and the petitioner now appeals. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Travis N. Meeks, Clarksville, Tennessee, for the appellant, D'Angelo Marquez Jenkins.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Robert Nash, Assistant District Attorney General, for the appellee.

## OPINION

### I.  Factual Background

The Montgomery County Grand Jury indicted the petitioner for aggravated robbery, reckless endangerment, aggravated assault, and being a felon in possession of a handgun.

The case proceeded to trial; however, following the presentation of several of the State's witnesses, the petitioner agreed to plead guilty.

The record reflects that at trial, the witnesses testified that at 4:30 a.m. on May 1, 2007, a masked gunman entered a BP gas station and demanded money. A second masked man was outside the store and told a person who was at the gas pumps to leave.

Although none of the witnesses who testified at trial identified the perpetrators, the State's next scheduled witness, the petitioner's girlfriend, Lynda Johnson,[1] would have testified that the gunman was Gregory Shawn Robinson and that the masked man outside the store was the petitioner. Johnson maintained that she was waiting in the getaway car with Preston Page, who was driving, while the petitioner and Robinson committed the robbery. The State further planned to adduce proof that police found the petitioner, Robinson, Page, and Johnson at Robinson's house shortly after the robbery.

Immediately prior to the State calling Johnson as a witness, the petitioner entered into a plea agreement. He pled guilty to facilitation of aggravated robbery and, despite being a standard, Range I offender, agreed to accept a Range II sentence of seven years and six months in the Tennessee Department of Correction, with release eligibility after service of thirty percent of the sentence in confinement. He also pled guilty to being a felon in possession of a handgun, with an agreed sentence of two years probation which was to be served consecutively to the facilitation of aggravated robbery sentence. The remaining charges were dismissed.

Thereafter, the petitioner filed a petition for post-conviction relief, asserting that his trial counsel was ineffective and that his guilty pleas were not knowingly and voluntarily entered. The petitioner contended that trial counsel failed to interview or subpoena witnesses. Specifically, the petitioner maintained that Page, Chris Richards, Moleena James, Christopher Harris, and Ebony Reed would have impeached Johnson's proposed testimony about what happened prior to and during the robbery. The petitioner further maintained that trial counsel should have pursued DNA evidence. Additionally, the petitioner stated that his guilty pleas were the result of counsel's ineffective assistance and prosecutorial misconduct.

At the post-conviction hearing, the petitioner testified regarding counsel's failure to subpoena witnesses. The petitioner said that counsel told him that witnesses had been subpoenaed.

The petitioner said that because Johnson had given a pretrial statement, the defense

---

[1] This witness is alternately referred to as "Linda" and "Lynda" in the record.

was aware of the substance of her prospective trial testimony. In her statement, Johnson maintained that immediately prior to the robbery, she was "riding around for hours" with the appellant, Page, and Robinson while they planned the crime. The petitioner acknowledged that none of his proposed witnesses could have accounted for his whereabouts at 4:30 a.m. on May 1, 2007, the time of the robbery. However, he asserted that his witnesses would have accounted for his whereabouts earlier that night, thereby impeaching part of Johnson's testimony. Specifically, the petitioner said that Reed would have testified that the petitioner was with her in Oak Grove, Kentucky until around midnight prior to the robbery. The petitioner said that Harris would have testified that the petitioner was with Harris "around . . . the same time" Johnson maintained the petitioner was purportedly planning the robbery with Robinson.

The petitioner said trial counsel told him that Page, Johnson, and Robinson had entered guilty pleas which required them to testify against the petitioner. The petitioner asked trial counsel to interview them to learn the content of their proposed testimony. The petitioner said that counsel talked with Johnson and Robinson, but he never spoke with Page. The petitioner said that he learned in the middle of trial that Page was not present to testify. The petitioner maintained that Page would have testified that Johnson was lying and that the petitioner's version of events was correct.

The petitioner recalled that while his case was pending, he spoke with Detective Nalley about an unrelated case against Johnson. The petitioner said he showed Detective Nalley a letter which stated that neither Johnson nor the petitioner were involved in the other crime. However, when Detective Nalley showed Johnson the letter, he led her to believe the petitioner was implicating her in the other crime, causing her to have a "personal vendetta against [the petitioner] to give the testimony that she gave on this case." The petitioner said he asked trial counsel to subpoena Detective Nalley to testify, but counsel failed to comply.

The petitioner stated that near the time of his trial, he agreed to testify against Kenneth Peachman, which caused "a big conflict in the streets amongst a lot of individuals, including . . . Robinson." The petitioner said that he wanted to call his mother to testify at trial regarding Robinson's bias against the petitioner and threats Robinson made to her. According to the petitioner, counsel said he spoke with the petitioner's mother, but the petitioner's mother denied that she spoke with counsel.

The petitioner stated that he attempted to fire trial counsel the night before trial. He said that counsel told him that because he had already fired one attorney, the trial court would not agree to his request.

Regarding the petitioner's claims of prosecutorial misconduct and ineffective

assistance of counsel, the petitioner said that the night prior to his trial he attended a meeting with trial counsel; the prosecutor, Helen Young; Detective Averett; and Johnson at the District Attorney General's office. Trial counsel told the petitioner that they were going to talk about some things the petitioner needed to know. The petitioner told trial counsel that he did not want to attend the meeting because he felt the State was "trying to corner me into another charge." However, trial counsel told the petitioner that the meeting was in the petitioner's best interest.

The petitioner said that Young asked him in front of Johnson why he told Johnson that he had been offered a fifteen-year sentence when he had been offered a three-year sentence. When Young asked if Johnson was not "worth three years," the petitioner explained that he would not plead guilty to a crime he did not commit. The petitioner maintained that Johnson did not want to testify against the petitioner, so Young held the meeting to persuade Johnson to testify. The petitioner said that during the meeting, Young threatened that if he looked at Johnson, Young would "slap [him] with gang intimidation so fast it'll make [his] head spin."

The petitioner said that Young told him that "federal agents" were interested in pursuing charges against him if he did not plead guilty. The petitioner told Young that if Johnson, Page, and Robinson testified against him, their "lies aren't going to come together." Young told the petitioner that she would let it be known that the petitioner had been an informant if he refused to plead guilty and proceeded to trial. Young told the petitioner that she could prove he knew about the robbery and that the trial judge would give him "the max" because the judge did not like him. Young told the petitioner that she was trying to help him.

Regarding the DNA evidence, the petitioner recalled that he was arrested on May 1, 2007. On May 22, 2007, police interviewed him about the robbery. At the interview, Officer Shawn Averett told the petitioner that a witness had identified him as the masked man outside the BP. Officer Averett also told the petitioner that police had found the mask the petitioner wore during the robbery and that they had also found DNA on the mask. Officer Averett asked the petitioner to submit a DNA sample to establish his innocence. The petitioner consented to giving a DNA sample.

The petitioner stated that he told trial counsel about submitting a DNA sample, but counsel never obtained the results of the DNA testing. The petitioner maintained that he asked counsel to file a motion for a hearing to get the results. Counsel told the petitioner that the trial court would not grant the hearing but that the State would not be allowed to withhold DNA results. The petitioner said that at trial, counsel told him that no DNA evidence would be submitted and that he should accept the plea bargain offered by the State. The petitioner said that he and trial counsel argued during trial about the lack of witnesses and DNA evidence. The petitioner stated that Young saw them arguing and offered the petitioner a

-4-

seven-year deal so that Johnson would not have to testify against the petitioner. Young also said that Johnson would receive a lesser sentence. The petitioner accepted the guilty plea to get "out from all the ineffective assistance of counsel." The petitioner maintained that if trial counsel had called witnesses to contradict Johnson's testimony and if trial counsel had pursued the DNA results, the petitioner would have continued with the trial instead of pleading guilty.

Trial counsel testified that he did not recall the petitioner asking him to subpoena witnesses to trial and that he did not subpoena any witnesses. Counsel said he tried to contact Page by telephone, but he assumed Page would not talk to counsel because Page was a "person of . . . interest in this case." Counsel acknowledged that he did not contact Reed or Christopher Edwards. He said that he never told the petitioner that he had subpoenaed witnesses.

Trial counsel stated that he spoke with Robinson the day of trial and that he had previously spoken with Robinson's attorney. Counsel said that from his conversations with Robinson, he learned that Robinson would implicate the petitioner in the robbery. Counsel believed that Robinson's plea agreement required him to testify against the petitioner.

Counsel said that Johnson was never charged for her role in the crime. He knew Johnson intended to testify at trial, and he knew the substance of her testimony from her pretrial statement. Counsel said that he did not know of a witness who could refute Johnson's version of events. Trial counsel said that his strategy at trial was to establish reasonable doubt as to the petitioner's participation in the crime.

Trial counsel stated that he did not recall the petitioner attempting to fire him the night before trial. He said that the petitioner had continually expressed interest in entering a guilty plea and that the petitioner wanted him to "deal more with settlement rather than defense." Counsel told the petitioner about the State's plea offers, and the petitioner said that he was not satisfied and that he would proceed to trial.

Trial counsel said that he did not recall the petitioner asking to leave the meeting with Young and Johnson. Counsel did not recall Young threatening to expose the petitioner as an informant if he refused to plead guilty. Counsel recalled that Young told the petitioner that she had spoken with federal authorities who were "interested in this matter." However, Young did not threaten the petitioner with federal prosecution if he did not plead guilty.

Trial counsel said that the State never mentioned that Johnson would receive favorable treatment in an unrelated case if the petitioner pled guilty. Trial counsel said that the petitioner did not think Johnson would testify against him. Therefore, the purpose of the

meeting was to convince the petitioner that Johnson intended to testify. Trial counsel wanted to be at the meeting to hear and assess Johnson's demeanor and proposed testimony.

Trial counsel stated that the credibility of Johnson and Robinson was important because they were the only witnesses to put the petitioner at the scene of the robbery. Counsel recalled that Johnson had been involved in "an incident" that could have been used to impeach her credibility. Moreover, Robinson had additional criminal history.

Counsel stated that he did not recall DNA being a significant issue at trial and that he did not tell the petitioner that his DNA had been tested. Counsel recalled that DNA was found on a cap or a hat but that the DNA pertained to clothing worn by Robinson, not the petitioner.

Counsel said that three or four witnesses had testified for the State before the petitioner decided to enter his guilty pleas; however, none of them had identified the petitioner. Counsel said the petitioner pled guilty during a recess before Johnson and Robinson could testify. Counsel said that he had never lied to or misled the petitioner.

Helen Young, the Assistant District Attorney General who prosecuted the petitioner's case, testified that about an hour after the robbery, the petitioner and Robinson were apprehended at Robinson's house. In the attic, police found a distinctive pair of blue jeans which matched those worn by the robber, Robinson, on the surveillance video. Young testified that no DNA testing was done on the clothing and that "there was never any representation there was any [DNA evidence]." She surmised that Detective Averett took a buccal swab from the petitioner for DNA testing "out of frustration." Trial counsel asked about potential DNA evidence, and she told counsel that the evidence was never submitted for testing.

Young said that she had a "history" with the petitioner and that he asked to see her when he was arrested. Young stated that the meeting she had with the petitioner the day before trial was "multipurpose." Young said that because the case against the petitioner was not as strong as the case against Robinson, she offered the petitioner a plea bargain that included a probated sentence to allow him to avoid incarceration due to his fear of prison. Later, when the case against the petitioner was stronger, she offered him three years to serve "locally" because of his fear of prison.

At the meeting the day before trial, Young offered the petitioner a deal, which he refused. The petitioner told Young that Johnson "won't look [him] in the eye and testify." Young acknowledged that Johnson gave a statement implicating Robinson and the petitioner but that Johnson said she loved the petitioner and did not want to testify against him. Johnson

asked Young to offer the petitioner a "deal." Because of the petitioner's cooperation on other matters, Young felt she should tell the petitioner about Johnson testifying against him. She also wanted to let Johnson know that the petitioner lied to Johnson about being offered a ten-year deal instead of a three-year deal.

Young denied that she threatened to expose the petitioner as a confidential informant. Young acknowledged, however, that she had spoken with federal agents who were interested in prosecuting the petitioner and that she informed the petitioner of the possibility of federal prosecution.

She stated that while Johnson and the petitioner were in jail, they corresponded through letters. Young maintained that there were allegations that the petitioner was trying to intimidate Johnson. She acknowledged that at the meeting, she warned the petitioner he would be charged with a crime if he tried to coerce or intimidate Johnson.

Young said that Johnson was the last "civilian witness" scheduled to testify before the officers and forensic experts. Johnson told Young that "she'd rather do anything else in the world but she's going to testify." Johnson "was shaking; she was scared" because the case involved "gang members." Immediately before Johnson testified, she asked Young to offer the petitioner another plea deal. Young relented and offered an agreement that included a seven-and-a-half-year sentence. She recalled that the petitioner was a standard Range I offender but that he pled as a multiple Range II offender to facilitation to avoid a mandatory eight-year sentence. The agreement further provided that the petitioner would have Range I release eligibility after serving thirty percent of his sentence in confinement.

Young said that she was "shocked at what a good job" the petitioner's trial counsel had done, specifically noting that counsel knew when to be quiet and not "accentuate any of the strong points of the prosecution." She said there were no statements from witnesses that could possibly provide an alibi for the petitioner. She acknowledged that at the time of the petitioner's guilty plea, none of the State's witnesses had formally identified the petitioner as one of the perpetrators; however, she stated that Johnson, who was scheduled to testify next, would have identified the petitioner.

Preston Page testified for the petitioner that he was seventeen years old at the time of the offense. He stated that he was in the house with the petitioner, Johnson, and Robinson when they were arrested. He did not recall being contacted or subpoenaed by anyone about what happened that night. He also did not recall giving a statement to police. He stated that he did not know what happened that night. He denied that he drove the getaway car.

Two additional witnesses for the petitioner, Reed and Johnson, left the post-conviction

hearing before being called to testify. However, the post-conviction court allowed the petitioner to file affidavits concerning the witnesses' proposed testimony. Reed's affidavit stated that on the night of the robbery, she was living in Oak Grove, Kentucky, and that she saw the petitioner in Oak Grove "as late as midnight." Reed stated that the petitioner left by himself, telling Reed "that he had borrowed a car from a friend and he had to return it shortly after midnight."

Johnson's affidavit stated that her trial "testimony would be the same as [her] previously given statement," which was attached to the affidavit as an exhibit. In her statement, Johnson said that Robinson and the petitioner robbed the BP. She said that she was with Robinson and the petitioner hours before, during, and immediately after the robbery. She said that the petitioner and Robinson talked about "hitting the store," which meant they wanted to "rob the store." They left the house in Robinson's car and "rode around." At the time of the robbery, Page was driving. When Robinson and the petitioner got out of the car to go to the BP, Robinson told Johnson to keep watch for them. The men came running back a few minutes later. Both Robinson and the petitioner put their guns on the floor of the car. Page drove toward Interstate 24 but pulled into the driveway of a Sonic restaurant where Robinson shot at someone. Afterward, they drove to Robinson's house. Shortly thereafter, police came and detained them. Johnson said that she, Page, Robinson, and the petitioner were all Blood gang members.

The post-conviction court denied the petition. The court found that the petitioner understood the agreement, that he was not coerced into pleading guilty, and that he entered the plea to avoid "the risk of trial." The court accredited trial counsel's testimony that the petitioner did not ask counsel to subpoena witnesses or provide a list of witnesses. The court stated that Reed's affidavit provided, at best, "minor cross examination as to a location at a time different from the aggravated robbery." The court found that Page's testimony was not credible, stating that Page's lack of memory was "convenient." The court stated that the petitioner "was and is very knowledgeable about pleas, prison, probation etc." Additionally, the court stated:

> Even if the Petitioner had provided [the names of witnesses], these persons were interviewed and testified, they would have presented no evidence that would have or could have affected the outcome of the case. The Petitioner had relied upon [Johnson] not testifying. At the time of the plea he knew she would testify. What was he to do? The Petitioner decided to renegotiate his offer. He did [s]o intelligently and knowingly. He did so with an attorney prepared for trial.

The court further found that there was no evidence of prosecutorial misconduct.

On appeal, the petitioner challenges the post-conviction court's ruling, maintaining that counsel's actions, or inactions, "allowed coerced, forced and mis[led the petitioner] to enter into a guilty plea that was neither knowingly or voluntarily made." The petitioner further alleges that the petitioner's guilty plea "was the result of prosecutorial misconduct."

## II. Analysis

To be successful in his claim for post-conviction relief, the petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Notably,

> [b]ecause a petitioner must establish both prongs of the

test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697). Moreover, in the context of a guilty plea, "the petitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial." Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998); see also Hill v. Lockhart, 474 U.S. 52, 59 (1985).

When a defendant enters a plea of guilty, certain constitutional rights are waived, including the privilege against self-incrimination, the right to confront witnesses, and the right to a trial by jury. Boykin v. Alabama, 395 U.S. 238, 243 (1969). Therefore, in order to comply with constitutional requirements a guilty plea must be a "voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31 (1970). In order to ensure that a defendant understands the constitutional rights being relinquished, the trial court must advise the defendant of the consequences of a guilty plea, and determine whether the defendant understands those consequences. Boykin, 395 U.S. at 244.

In determining whether the petitioner's guilty pleas were knowing and voluntary, this court looks to the following factors:

> the relative intelligence of the [petitioner]; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993).

The petitioner complains that trial counsel failed to interview witnesses or subpoena witnesses on the petitioner's behalf. He specifically alleges that Page's testimony would have impeached Johnson's proposed testimony. The petitioner also avers that counsel was ineffective by failing to interview Robinson prior to trial. The petitioner further maintains

-10-

that Chris Richards, Moleena James, Christopher Harris, and Ebony Reed would have testified about the petitioner's "whereabouts earlier that night," citing Reed's affidavit about the petitioner's location prior to midnight.

The post-conviction court found that Page's testimony was not credible and that Reed's testimony would have offered little help to the petitioner's case. Regarding the other witnesses mentioned by the petitioner, we note that he failed to present their testimony at the post-conviction hearing. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We may not speculate on what benefit these witnesses might have offered to the petitioner's case, nor may we guess as to what evidence further investigation may have uncovered. Id. Accordingly, the petitioner has failed to demonstrate prejudice in this regard.

The petitioner contends that he was prejudiced by trial counsel "not being prepared and not having any theory or evidence for a defense." He complains that trial counsel should have pursued DNA testing on the clothing allegedly worn by the robbers. The petitioner asserts that he was misled into believing that DNA testing was being performed. However, trial counsel and Young, whose testimonies were accredited by the post-conviction court, stated that the petitioner was never misled into believing that DNA evidence would be used against him at trial. Young stated that DNA testing was not performed and could have only been conducted on clothing worn by Robinson, not the petitioner.

The petitioner complains that "[t]rial counsel misled and allowed the Petitioner to be used by Young to help bolster the State's case against him. Petitioner was unknowingly and involuntarily forced into a meeting whereby the Petitioner was used to convince the State's key witness to testify at trial." Additionally, the petitioner maintains that Young's "threats" during the meeting amounted to prosecutorial misconduct. He states that he "felt forced to plea due to all the threats, manipulation and lying."

Young stated that she had been in contact with federal authorities about the petitioner and that she cautioned the petitioner that federal authorities were considering prosecuting him. She further stated that she knew the petitioner did not believe that Johnson would testify against him. Young felt she "owed it" to the petitioner to make him aware of the actual strength of the State's case against him, namely that Johnson intended to testify. Young stated that she warned the petitioner to not intimidate Johnson because of prior allegations that he had attempted to intimidate witnesses. Counsel said that the petitioner never stated that he did not want to attend the meeting with Young and Johnson. Moreover, counsel stated that the meeting was informative, noting that he wanted to see and hear

Johnson's prospective testimony.

From the foregoing, we conclude that the post-conviction court did not err in finding that the petitioner failed to prove that counsel was ineffective or that his guilty pleas were not knowingly and voluntarily entered.

### III.  Conclusion

In sum, we conclude that the petitioner failed to prove his claims for post-conviction relief.  Therefore, the judgment of the post-conviction court is affirmed.


_____
NORMA McGEE OGLE, JUDGE